UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PROSHIPLINE INC.,

                                    Plaintiff,

                                                              07 Civ. 10969 (RWS)

                    - against -


ASPEN INFRASTRUCTURES LTD., f/k/a
SUZLON INFRASTRUCTURE LTD.,

                                    Defendant.
-------------------------------------------------------------X


# MEMORANDUM OF LAW
# IN SUPPORT OF APPLICATION
# TO VACATE MARITIME ATTACHMENT


**DEORCHIS & PARTNERS, LLP**
61 Broadway, 26th Floor
New York, New York 10006-2802
(212) 344-4700

*Attorneys for Defendant*
**ASPEN INFRASTRUCTURES LTD.**


John A. Orzel
*-of Counsel-*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

      *The Sales and Logistics Services Agreement* ...................................................... 3

      *ProShipLine, Inc.* ................................................................................................ 4

      *The End of the Agreement* .................................................................................. 5

      *Legal Proceedings* ............................................................................................. 9

            *August 6, 2007:  EP-Team and ProShipLine v. Aspen Infrastructures:*
            *CO7-2549*................................................................................................ 10

            *August 30, 2007:  Singapore Arbitration Demanded by Aspen*
            *Against EP-Team* ................................................................................... 11

            *October 12, 2007:  Aspen Infrastructres Ltd. v. E.P. Team, Inc.:*
            *07Civ. 8813(RWS)*................................................................................. 12

            *November 27, 2007:  EP-Team and ProShipLine v. Aspen:*
            *07 Cv. 5660 (FDB)*................................................................................ 13

            *December 3, 2007: ProShipLine v. Aspen: 07 Civ. 10969 (RWS)*........................ 14

            *December 7, 2007:  EP-Team/ProShipLine v. Aspen:  07 cv-4170*...................... 14

LEGAL ARGUMENT............................................................................................................ 15

    POINT I
    EP-TEAM/PROSHIPLINE HAS FAILED TO MEET ITS BURDEN
    TO ESTABLISH A RIGHT TO MAINTAIN THE ATTACHMENT.................. 15

        *a.*     *Proshipline's claims being asserted in this action are executory*
              *and will not support admiralty jurisdiction* ............................................... 16

        *b.*     *PROSHIPLINE is not entitled to a Rule B Attachment because*
              *Aspen is amenable to suit in the United States District Court for*
              *the Southern District of Texas, where PROSHIPLINE has its*
              *headquarters and principal place of business* ........................................... 17

       c.     *By seeking a Writ of Maritime Attachment under the name of ProShipLine only, EP-Team/ProShipLine has perverted the intent of Rule B* ...............18

POINT II
     ASPEN IS ENTITLED TO HAVE THE AMOUNT OF PROSHIPLINE'S ATTACHMENT LIMITED TO A REASONABLE AMOUNT .........................22

POINT III
     ASPEN IS ENTITLED TO COUNTER SECURITY UNDER SUPPLEMENTAL RULE E(7)..........................................................................24

CONCLUSION..............................................................................................................25

## TABLE OF AUTHORITIES

## CASES

*Afram Lines Int'l v. m/v CAPTAIN YIANNIS,*
    905 F.2d 347 (11th Cir. 1990) ........................................ 24

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,*
    460 F.3d 434 (2d Cir. 2006)..................................... 1, 15,16,17,20

*Blake Maritime v. Petrom,*
    2005 WL 2975335 at *2 (S.D.N.Y.) ................................. 21

*Chiquita Int'l Ltd. v. m/v BOSSE,*
    2007 U.S. Dist. LEXIS 75729 (S.D.N.Y.) ...................... 20,21

*Daeshin Shipping v. Meridian Bulk Carriers,*
    2005 U.S. Dist. LEXIS 22409 (S.D.N.Y.) ......................... 23

*Dolco Investments v. Moonriver Development,*
    486 F. Supp. 2d 261 (S.D.N.Y. 2007)............................... 17

*Dongbu Express v. Navios,*
    944 F. Supp. 235 (S.D.N.Y. 1996)................................... 23

*Greenwich Marine v. s/s ALEXANDRA,*
    339 F.2d 901 (2d Cir. 1965)............................................ 21

*Rapture Shipping Ltd. v. Allround Fuel Trading B.V. Chemoil,*
    *No. 06 Civ. 5296, 2006 U.S. Dist. LEXIS 60771, 2006 WL 2474869, at *2* ............ 19,20

*Result Shipping v. Ferruzzi Trading USA Inc.,*
    56 F.3d 394 (2d Cir. 1995); ........................................... 24

*Ronda Ship Mgmt. v. Doha Asian Games Organizing, Comm.,*
    No. 07 Civ. 94, 2007 U.S. Dist. LEXIS 72694, 2007 WL 2812897, at *3
    (S.D.N.Y. Sep. 20, 2007) ............................................... 15

*Sea Transport Contractors v. Indus. Chemiques du Senegal,*
    411 F. Supp. 2d 386 (S.D.N.Y. 2006)........................... 21,22

*Seawind Compania, S.A. v. Crescent Line, Inc.,*
    320 F.2d 580 (2d Cir. 1963)............................................ 19

*Steamship Overdale Co. v. Turner,*
    206 F. 339 (E.D. Pa. 1913) ............................................ 17

*Titan Nav. v. Timsco, Inc.,*
    808 F.2d 400 (5th Cir. 1987) ............................................................. 25

## **STATUTES**

Fed. R. Civ. P. Supp. R. E ............................................................. 1,2,16,22,24

## <u>INTRODUCTION</u>

Aspen Infrastructures Ltd., (hereinafter "Aspen") moves for an Order pursuant to Supplemental Admiralty Rule E (4)(f) of the Federal Rule of Civil Procedure vacating the Order and Process of Maritime Attachment and Garnishment issued at the request of ProShipLine Inc., by this Court on December 3, 2007 because Aspen was "found" within the jurisdiction of this Honorable Court by virtue of its having appeared as the plaintiff in an action against EP-Team Inc., bearing Civil Action Number 07 Civ. 8813 (RWS).  The plaintiff in 07 Civ. 10969 (RWS), ProShipLine, Inc., (Delaware) asserted in its Complaint that it had claims against Aspen as the assignee of all of the rights and liabilities of EP-Team, Inc., under a certain Sales and Logistics Services Agreement (hereinafter "the Agreement") between Aspen and EP-Team, Inc., which is the basis for all contract claims alleged by the parties in both actions.

Alternatively Aspen seeks an Order from the Court vacating the attachment on the grounds that Aspen is present in the United States District Court for the Southern District of Texas where both ProShipLine and EP-Team are headquartered and therefore present.   In addition, ProShipLine has given written notice that it intends to pursue its claim against Aspen in that jurisdiction and not by way of the Arbitration in respect of which this attachment was sought and granted.  *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006).

Alternatively, in the event that the Court does not vacate the current attachment, Aspen seeks an Order from the Court pursuant to Supplemental Admiralty Rule E (6) reducing the amount of the attachment to the assets already seized by ProShipLine/EP-Team as a result of an action filed against Aspen in the United States District Court for the Western District of

Washington which amount is far in excess of any conceivable Maritime claim against Aspen under the Agreement.

Aspen further requests that in the event the Court does not vacate the current attachment that the Court Order that ProShipLine post countersecurity in the amount of US$908,516.40 pursuant to Supplemental Admiralty Rule E (7)(a).  Since ProShipLine asserts that it has a contractual claim against Aspen but is not prepared to abide by the arbitration provisions of that very same contract, security is required to secure Aspen's counter claims against ProShipLine relating to conversion of funds belonging to Aspen by ProShipLine and alleging tortuous interference with Aspen's maritime contracts and tortuous interference with Aspen's business activities.

Aspen further requests that the Court Order such further, additional and different relief as the Court may deem just and proper.

## STATEMENT OF FACTS

Aspen is a corporation existing pursuant to the laws of India with its headquarters located in Pune. Aspen is an associated company of Suzlon Energy Ltd. which is engaged in the manufacture and marketing of alternative energy production devices, in particular windmills. *See Declaration of Sanjeev Bangad at ¶ 1.* (Hereinafter "*Bangad Decl.*")  As part of its business Aspen engages in the transportation of cargo by ocean going vessel.  Aspen's transportation interests center around the movement of windmill components from factories in India to the market countries, including the United States.  In an attempt to avoid the "deadhead" return of empty vessels from the market countries to India, Aspen entered into the contract carriage business, soliciting cargos in the market countries with destinations in Asia.  *Bangad Decl. a ¶ 1.*

***The Sales and Logistics Services Agreement:***

In order to better take advantage of back-haul opportunities in the United States, Aspen entered into a Sales and Logistics Services Agreement dated April 9, 2006, (hereinafter referred to as "Agreement") with EP-Team, Inc., which was a Nevada corporation with its principal place of business located in Houston, Texas.[1] *See Bangad Decl. at ¶ 4 and Exhibit A.* The Agreement provided that Aspen would appoint EP-Team as its "General Sales and Port Services Agent of [Aspen] in the USA." *Bangad Decl. at ¶ 4.* EP-Team was to establish a sales and management operation to secure freight and other associated revenue for vessels controlled by Aspen calling at the United States. In addition EP-Team was to act as the port agent for the Aspen controlled vessels calling at US ports, arranging terminal facilities, stevedoring services, cargo handling services, and documentation services. *Bangad Decl. Exhibit A.*

The Agreement provided that any dispute under the Agreement was to be resolved by arbitration in Singapore and that the contract shall be construed and enforced in accordance with English law:

### 13. APPLICABLE LAW

This agreement shall be construed and enforced in accordance with English Law.

### 15. ARBITRATION

If any dispute arises between the parties out of or in connection with the agreement whether in the nature of interpretation or meaning of any term hereof or as to any claim by one against the other, or otherwise, the same shall be referred to arbitration of a common arbitrator if agreed upon or to arbitrators one to be appointed by each party to the dispute and the arbitration shall be governed by the Arbitration Act for the time being in force. Unless the parties to the dispute mutually agree to the location of the arbitration, the arbitration shall be held in Singapore.

---

[1] For the sake of accuracy, Aspen entered into the Agreement under the name of its predecessor company, "Suzlon Infrastructure, Ltd." The name "Aspen" was adopted after the April 9, 2006 date and was of course disclosed to EP-Team. EP-Team was a company incorporated in Nevada, but, without notice to Aspen, in April/May 2007 a new, identically named, company was formed in Delaware and its business was apparently "merged" with the new company and the Nevada company was apparently dissolved. *Bangad Decl. at ¶ 4.*

**ProShipLine, Inc.**

In order to fulfill its obligation to "establish a sales and management operation" as provided by the Agreement, EP-Team established ProShipLine Inc. *Bangad Decl. at ¶ 3*. Aspen was aware of the creation of ProShipLine and agreed with EP-Team that ProShipLine should be identified to third parties as acting as agent for Aspen. At no time, however, did Aspen enter into a contractual relationship with ProShipLine, nor did it agree to the assignment of any right or obligation under the Agreement by EP-Team to ProShipLine. *Bangad Decl. at ¶ 3*. Aspen dealt with ProShipLine simply as the organization set-up by EP-Team to carry out some of EP-Team's obligations under the Agreement. *See Bangad Decl. ¶ 4.*[2]

In its own right and through ProShipLine, EP-Team purported to carry out its obligations under the Agreement by arranging terminal facilities, taking care of issuing bills of lading on behalf of Aspen, arranging for cargo handling on the vessels and the receipt and delivery of cargo. *See Bangad Decl. ¶ 3*. Most importantly for present purposes, EP-Team, acting directly and/or through ProShipLine also collected freight due to Aspen for cargo carried on board Aspen controlled vessels to or from the United States, as provided for by the contract. *See Bangad Decl. ¶ 7*. For this purpose, EP-Team, through ProShipLine opened an "impress account" at the Bank of America bearing account number 4880 0043 9659 into which funds collected on behalf of Aspen were to be deposited and from which authorized payments were to be made. *See Bangad Decl. ¶ 11*.

---

[2] EP-Team has alleged that it had given Aspen notice of ~~its~~ assignment of the contract to ProShipLine by letter dated April 25, 2006 addressed to Sanjeev Bangad. Mr. Bangad cannot trace ever having received such a letter and notes that it does not actually give notice of an assignment, that unlike regular communications between the parties it is in original letter form only (and not fax or e-mail) and that ProShipLine, Inc. (Nevada) was a incorporated only on 3rd May 2006. *Bangad Decl. at ¶ 2*.

### *The End of the Agreement*

Aspen was not particularly pleased with the way that the US business was developing. Aspen did not believe that EP-Team had devoted sufficient resources or manpower to the securing of cargos for Aspen controlled vessels. Aspen did not believe that it was obtaining as much cargo as possible or at the best possible freight rates for its vessels. *See Bangad Decl. ¶ 5.*

In addition to the commercial concerns that Aspen had with EP-Team's performance under the Agreement, there were significant financial irregularities in connection with EP-Team's administration of the Aspen Impress Account. *See Bangad Decl. ¶ 5.* Beginning in mid-2006, Aspen began to communicate its concerns with EP-Team's performance under the Agreement, mainly by e-mail from Sanjivv Bangad to David Pulk, the president of EP-Team. *See Bangad Decl. ¶ 5.* Throughout the remainder of 2006 and into 2007 Aspen continued to complain about the way that EP-Team was performing under the Agreement. *See Bangad Decl. ¶ 5.*

Matters between Aspen and EP-Team had come to a head by June 13, 2007 when Sanjivv Bangad sent an e-mail message to David Pulk, the president of EP-Team, referring to the fact that Mr. Pulk had stopped replying to correspondence and had not returned telephone calls from Mr. Bangad:

**From:** sbangad@suzlon.com [mailto:sbangad@suzlon.com]
**Sent:** Wednesday, June 13, 2007 8:47 PM
**To:** david.pulk@ep-team.net; neil.johnson@ep-team.net
**Cc:** sbangad@suzlon.com
**Subject:** Fw:

Dear David,

I have called you several times since morning but to no avail. Reference mail sent out earlier, AIL has decided to set up its own office in Houston shortly and thus the present arrangements will continue only till then. We wanted to meet you in Houston and convey the same however you chose to ignore and thus the need to send SMS. Hope it is understood well and that with increased shipments and a terminal to manage this had become absolutely needful.

Certain other options were discussed with Jessie but there is no response, so presume not interested.

Regards,

Sanjeev Bangad

7/9/2007

Having received no response from EP-Team or Mr. Pulk, Sanjivv Bangad sent a further e-mail message to Mr. Pulk which was intended to notify EP-Team that Aspen proposed to effect the transfer of its controlled vessels to a new desponent owner and that the new owners would be making their own arrangements for a US agent. Aspen did not intend that this notice was to be a notice of termination as provided for in the Agreement, although it would effectively have meant that at least part of the activities under the Agreement would not be required, at least for the time being. Sanjivv Bangad did intend that this e-mail was to give notice that the "new owners" would be making their own agency arrangements[3]:

| | |
|---|---|
| From: | Sanjivv G Bangad [sbangad@suzlon.com] |
| Sent: | Thursday, July 05, 2007 1:09 AM |
| To: | david.pulk@ep-team.net; neil.johnson@ep-team.net |
| Subject: | RE: |
| Importance: | High |

Dear Sirs,

In continuation of below message, please note that from 1st of August 07, the owners ( SE Shipping lines PTE LTD) will have alternate arrangements in place and thus Proshipline will seize to be our agents.

This serves as required notice.

Regards,

Sanjivv G Bangad
General Manager-International Logistics
Suzlon Energy Ltd.
3rd Floor, Weikfield IT City Infopark
Survey No. 30/3, 31/1 & 2 A, Vadgaonsheri, Nagar Road | Pune - 411 014 | India.
Email: sbangad@suzlon.com
Mob: +91 9881072835
Board: +91-20-401 21999, Direct: +91 20 40121105  Fax:+91-20-4012 1100 / 1200

*See Bangad Decl. at ¶ 7 and Exhibit D  thereto.*

In response to the July 5, 2007 e-mail, EP-Team's legal counsel, Messrs. Shannon Gracey Ratliff & Miller, LLP., (hereinafter "ShannonGracey") sent a letter by both courier and e-mail. The ShannonGracey letter advised Aspen that EP-Team [it is important to note that it is on behalf of EP-Team and not ProShipLine that ShannonGracey wrote to Aspen] considered that the July 5, 2007 e-mail was a "purported termination" of the Agreement and that EP-Team

---

[3] It is accepted that the wording of the July 5, 2007 e-mail was confusing, although any confusion on the point in question was resolved by July 13, 2007 – see below. The Court will note that the original Complaint filed by Aspen in this action contained a paragraph noting that the July 5, 2007 e-mail was "notice of termination" of the Agreement. This was corrected in the amended Complaint which also reflected that EP-Team had agreed to arbitrate under the Agreement in Singapore.

believed that the purported termination was in violation of the Agreement and that EP-Team would hold Aspen responsible for damages under the Agreement. *See Bangad Decl. ¶ 8 and Exhibit E thereto.*

Any confusion with regard to whether the July 5, 2007 e-mail was a "termination" of the Agreement was addressed by the July 13, 2007 fax message from Aspen's London counsel which noted that it was the [intended] new desponent owners of the Aspen controlled vessels, SE Shipping Pte. Ltd., which was making other arrangements, not Aspen. *See Bangad Decl. ¶ 8 and Exhibit F thereto.*

On Monday, July 30, 2007 Shannon Gracey, legal counsel for EP-Team and ProShipLine sent a fax message to Aspen's London counsel stating that as Aspen had terminated the Agreement as of August 1, 2007, EP-Team/ProShipLine would no longer act on behalf of Aspen, in any capacity as of July 30, 2007:

## SHANNONGRACEY

SHANNON, GRACEY, RATLIFF & MILLER, LLP

*Attorneys and Counselors*

777 Main Street, Suite 3800
Fort Worth, Texas 76102
Telephone (817) 336-9333
Facsimile (817) 336-3735

Richard A. Lowe

Direct Dial: (817) 882-7653
Email: rlowe@shannongracey.com

July 30, 2007

Via Facsimile 011 44 20 7929 0440
Via United States Mail

Mr. Christopher Chauncy
Chauncy & Co.
Peek House
20 Eastcheap
London
EC3M 1EB

Re:  Sales and Logistics Services Agreement as of April 19, 2006 between Suzlon Infrastructure Ltd. and EP-Team, Inc. (the "Services Agreement"), as amended by Addendum No. 1 dated April 20, 2006, and further amended by Addendum No. 2 dated November 10, 2006

Dear Mr. Chauncy:

As we previously discussed, we understand you represent Suzlon Infrastructure Ltd (now Aspen Infrastructure Ltd. ("Suzlon")) with respect to matters relating to the Services Agreement.

On July 5, 2007, Mr. Sanjeev Bangad notified EP-Team (now ProShipLine) that as of August 1, 2007, EP-Team "will cease to be our agents." Currently, the Services Agreement covers the vessels Margaretha Green, Beluga Revolution, Beluga Eternity, Beluga Furion and Beluga Fascination. The Beluga Fascination was substituted in place of the Beluga Spirit and additional vessels under the Suzlon's control have been added.

The Services Agreement was specific that Suzlon appointed EP-Team as its exclusive sales agent to establish a sales and management operation to secure freight and associated revenue. On the basis of and in reliance upon this appointment, EP-Team has made substantial

Alliance        Arlington        Austin        Dallas        Houston
(817) 306-5962    (817) 795-4866    (512) 610-2700    (214) 245-3090    (713) 255-4700

---

SHANNON, GRACEY, RATLIFF & MILLER, L.L.P.

Mr. Christopher Chauncy
Chauncy & Co.
July 30, 2007
Page 2

investments in infrastructure, including personnel, office facilities and administration. I have attached a letter from Suzlon dated May 18, 2006, expressly stating that no one other than ProShipLine is authorized either to offer on ship or negotiate / accept freight / cargo.

The Services Agreement is very clear that the agency relationship was intended to remain co-extensive with the time chartering of the vessels. The actions of Suzlon clearly are in breach of the Services Agreement to the substantial detriment of EP-Team/ProShipLine.

Since Suzlon has wrongfully terminated the agency relationship as of August 1, 2007, please be advised that EP-Team/ProShipLine will as of Midnight July 31, 2007, not be in a position to act in any capacity on behalf of Suzlon and/or its assigned agents for any matters, including, but not limited to, executing/signing bills of lading, arranging cargo deliveries or providing other customary agency activities.

Yours very truly,

Richard A. Lowe

RAL/mf

*See Bangad Decl. ¶ 9 and Exhibit G thereto.*

EP-Team's repudiation of the Agreement was in direct violation of the Agreement's terms which provided that upon termination the parties were to continue to carry out their obligations with regard to shipments that were already underway and that the parties would cooperate with each other to ensure to proper closure of accounts. *See Bangad Decl. Exhibit A.*

Despite the position taken by EP-Team, that it has ceased to act as agent for Aspen as of midnight on July 31, 2007, EP-Team/ProShipLine continued to collect freight on behalf of Aspen and to effect certain payments out of the Aspen Impress Account at the Bank of America. It did so without providing Aspen with notice of what payments were made and what disbursements to third parties with whom it had contracted as agent for Aspen it did not intend to pay and without providing corresponding accounting or banking information (bank statements for the months June through October 2007 were only provided on December 14 2007). *See Bangad Decl. ¶ 9 and Exhibit J thereto.* EP-Team has refused to provide regular information with regard to the balance in the Aspen Impress Account. *See Bangad Decl. ¶ 9.* As of October 30, 2007, (the latest bank statement provided by EP-Team) the balance was US$ 684,328.07. *See Bangad Decl. ¶ 11 and Exhibit J thereto.* No information or bank statements have been received for the period since October 2007, but according to the Statement of Jessie Baiza executed on November 15, 2007 there was then about US$ 699,000.00 in the account. *Orzel Decl. at ¶ 3 and Exhibit G.* As EP-Team has no legal claim to the funds in the Aspen Impress Account, on August 3, 2007 Aspen instructed that the account balance should be transferred to Aspen's control. EP-Team has ignored Aspen's instructions and has failed to transfer the funds. *See Bangad Decl. ¶ 11.*

More troubling and potentially much more damning to EP-Team is the fact that it and/or ProShipLine affirmatively undertook to collect ocean freights which they were specifically told by Aspen were not to be collected. On July 11, 2007 ProShipLine enquired of Aspen who would be responsible for preparing bills of lading and collecting freight for a shipment on the m/v BELUGA FASCINATION from Bilbao, Spain to Sikka, India. *See Bangad Decl. ¶ 10 and Exhibit H thereto.* Sanjivv Bangad instructed EP-Team/ProShipLine that the movement was not within the geographic scope of the Agreement and that as a result Aspen would collect the freight on the shipment directly. *See Bangad Decl. ¶ 10.* EP-Team and ProShipLine, completely disregarding Sanjivv Bangad's instructions, undertook to invoice the shipper and to collect US$ 214,221.63 in ocean freight. *See Bangad Decl. ¶ 10 and Exhibit H thereto.* The bank statements received on December 14, 2007 reveal that the freight thus collected was paid by wire transfer into the impress account on June 30, 2007. It was immediately following this that ShannonGracey sent their faxed letter advising "that EP-Team/ProShipLine [would] as of midnight July 31, 2007, not be in a position to act in any capacity on behalf of Suzlon or its assigned agents…..". The funds are currently being held by EP-Team in the Aspen Impress Account together with the balance of other freight collected before and after June 30 2007 which EP-Team refuses to turn-over to Aspen. *See Bangad Decl. ¶ 11.*

***Legal Proceedings***

Aside from the Rule B action that was wrongfully filed by ProShipLine which is the subject of the current motion, EP-Team/ProShipLine has filed two law suits in the United States District Court for the Southern District of Texas and one law suit in the United States District

Court for the Western District of Washington.  EP-Team has also appeared in the arbitration proceeding instituted by Aspen under the Agreement in Singapore.  *See Bangad Decl. ¶ 16.*

- ***August 6, 2007:      EP-Team and ProShipLine v. Aspen Infrastructures: C07-2549:***

On August 6, 2007 EP-Team and ProShipLine jointly filed suit against Aspen in the United States District Court for the Southern District of Texas seeking declaratory relief:

- Clarifying the law to be applied to the construction and enforcement of the rights of the Plaintiffs and Defendant pursuant to the Contract;

- Specifying the forum for the arbitration of the dispute between the Plaintiffs and Defendant;

- Ordering the payment of the funds in the Account to the registry of the Court pending the resolution of the dispute between the parties by arbitration or otherwise.

*See Bangad Decl. at ¶ 16.*

Aspen appeared in the action and moved for an Order staying the litigation pending arbitration of the parties' disputes in Singapore, as required by the Agreement.  Following a hearing on the motion, on December 5, 2007 the action was administratively closed by the Court with the right of the parties to apply to reinstate the matter at the close of the Singapore arbitration.  *See Orzel Decl. ¶ 3  and Exhibit E  thereto.*

According to EP-Team/ProShipLine, it is currently [November 15, 2007] holding approximately US$699,000.00 in funds which are acknowledged as belonging to Aspen.  *See Orzel Decl. ¶ 3 and Exhibit G thereto.*

- ***August 30, 2007:  Singapore Arbitration Demanded by Aspen Against EP-Team:***

Aspen demanded arbitration under the Agreement in Singapore on August 30, 2007. Aspen addressed its demand to EP-Team as the contracting party under the Agreement.  *See Bangad Decl. ¶ 16.*  Despite notice given to counsel for EP-Team, no response to the arbitration demand was received by Aspen.  On October 9, 2007 Aspen's Singapore counsel invoked the default appointment procedure of the International Arbitration Act and asked that the Singapore International Arbitration Center ("SIAC") appoint an arbitrator on behalf of EP-Team.  On October 11, 2007 EP-Team, through its legal counsel, responded to the SIAC and advised that it would appoint an arbitrator.  EP-Team appointed its party arbitrator on October 16, 2007.

Within the context of the Singapore arbitration, counsel representing EP-Team approached Aspen's counsel and requested that Aspen agree that the proper party to the arbitration should be ProShipLine, not EP-Team.  Aspen advised EP-Team and the Singapore arbitration tribunal that it did not see a basis for ProShipLine to be substituted for EP-Team as the proper respondent in the Singapore arbitration proceedings.  Counsel representing both EP-Team and ProShipLine thereafter suggested that the arbitration demanded by ProShipLine against Aspen should proceed upon a parallel path to the Aspen against EP-Team arbitration and informed the arbitration tribunal that ProShipLine would serve a formal Request for Arbitration under the Agreement.  On December 10, 2007, the Singapore arbitration tribunal made a procedural order in the arbitration between Aspen and EP-Team in accordance with which the Statement of Claim of Claim was to be served by  December 21, 2007 and Statement of Defense by  January 16, 2008.

On December 13, the arbitration tribunal enquired about the status of the proposed parallel arbitration.   On December 14, 2007 counsel representing both EP-Team and

ProShipLine in Singapore advised the arbitration tribunal and Aspen that ProShipLine would not be instituting separate arbitration proceedings against Aspen in Singapore. Counsel advised that ProShipLine would seek to litigate its claims against Aspen in the United States District Court for the Southern District of Texas. *Bangad Decl. at ¶ 19 and Exhibit L thereto.* Later that day ShannonGracey in Houston advised counsel for Aspen in Houston that EP-Team had assigned to ProShipLine "all rights….. to sue for and recover damages from" Aspen "and/or for breach of any other obligations owed by [Aspen] to the [EP-Team]".

On December 21, 2007 Aspen submitted its formal "points of claim" with the Singapore arbitration tribunal. The points of claim were also served upon counsel representing EP-Team. EP-Team's response and counterclaim, if any, is due to be submitted on January 16, 2008.

- ***October 12, 2007:  Aspen Infrastructures Ltd. v. E.P. Team, Inc.: 07 Civ. 8813 (RWS):***

After EP-Team's filing of a declaratory judgment action in the Southern District of Texas, in violation of the arbitration provision of the Agreement, Aspen filed a suit against EP-Team in the United States District Court for the Southern District of New York on October 12, 2007 seeking the issuance of an Order and Process of Maritime Attachment against EP-Team. *See Orzel Decl. ¶ 1* . Subsequent to the filing of the New York action, EP-Team communicated its willingness to participate in the Singapore arbitration and record this and to correct an error in the original complaint, Aspen filed an amended complaint on October 14, 2007.  To date US$ 37,744.98 has been restrained by garnishee banks.  EP-Team has not appeared in the action.

- ***November 27, 2007:  EP-Team and ProShipLine v. Aspen: 07 Cv. 5660 (FDB):***

In what can only be a bad faith maneuver on the part of EP-Team/ProShipLine, suite was filed in the United States District Court for the Western District of Washington against Aspen on November 27, 2007.  The suit specifically named eight vessels which Aspen has on charter and which it has been using in its transportation service to the United States as garnishees and asked that the Court issue an Order and Writ of Maritime Attachment and Garnishment.  The suit was timed to coincide with the arrival of the m/v MARGARETHA GREEN at the port of Tacoma, Washington.  Upon arrival of the vessel within the jurisdiction of the Court, it was served with the writ.  The vessel was found to have bunker fuel and fuel oil on board that belonged to Aspen. In an effort to secure the release of the vessel as soon as possible, Aspen had posted a "Maritime Release Bond" in the amount of US$ 532,539.00 which represented the value of Aspen's property on board the vessel. *Orzel Decl. ¶ 4  and Exhibit H  thereto.*

Following the release of the MARGARETHA GREEN, the m/v BELUGA FUSION another vessel being used by Aspen in its transportation service to the United States called within the jurisdiction of the United States District Court for the Western District of Washington.  It was accepted that 151.1 tons of bunker fuel and all diesel fuel on board the vessel belonged to Aspen.  In response to an emergency motion by Aspen, the Court ordered that EP-Team/ProShipLine remove all of the subject property from the vessel by noon on December 30, 2007.  EP-Team/ProShipLine removed Aspen's fuel and is currently holding it within the jurisdiction of the Western District of Washington.  The value of the removed property was more than US$ 93,000.00.  In addition Aspen posted a bond in the amount of US$ 51,455.24.  *Orzel Decl. at ¶ 4  and Exhibit J  thereto.*

- ***December 3, 2007: ProShipLine v. Aspen: 07 Civ. 10969 (RWS):***

In a further attempt to disrupt Aspen's business in the United States, ProShipLine, as the sole plaintiff, filed suit against Aspen in the United States District Court for the Southern District of New York on December 3, 2007 seeking an Order and Writ of Maritime Attachment and Garnishment against Aspen in the amount of US$ 5,750,000.00.   ProShipLine also is seeking US$ 330,000.00 for attorney fees anticipated in the Singapore arbitration and US$ 310,000.00 to cover anticipated arbitrators' expenses in Singapore. *See ProShipLine's Verified Complaint at ¶ 14-15.*  ProShipLine's Verified Complaint states that the action against Aspen is brought to "obtain jurisdiction over Aspen" and to obtain security for any eventual arbitration award rendered in the Singapore arbitration. *See ProShipLine's Verified Complaint at ¶ 16.*

On Saturday, January 5, 2008 ProShipLine's counsel gave notice that US$1,999,964.00 had been restrained by garnishee Citibank. *Orzel Decl. at ¶ 6.*

ProShipLine's New York Rule B action claims to be in furtherance of the Singapore arbitration.   This is incorrect.   On December 14, 2007 ProShipLine, through its counsel in London and Singapore advised the Singapore arbitration tribunal that ProShipLine will not be pursuing any claims against Aspen in Singapore arbitration but will instead pursue its claims through litigation in the United States District Court for the Southern District of Texas. *Bangad Decl. at ¶ 19 and Exhibit L thereto.*

- ***December 7, 2007:  EP-Team/ProShipLine v. Aspen:  07 cv-4170:***

EP-Team/ProShipLine instituted a final US law suit when it filed an action in the United States District Court for the Southern District of Texas seeking an Order and Writ of Maritime Attachment and Garnishment against Aspen and naming the m/v BELUGA REVOLUTION as a

garnishee.  *Orzel Decl. at ¶ 5.*  Aspen successfully challenged the attachment on the grounds that Aspen is present within the jurisdiction of the Southern District of Texas.  The Court found that Aspen has a general agent within the jurisdiction and that it was amenable to service of process. *See Orzel Decl. ¶ 5  and Exhibit K, Opinion and Order dated December 18, 2007.*

## LEGAL ARGUMENT

### POINT I

### *EP-TEAM/PROSHIPLINE HAS FAILED TO MEET ITS BURDEN TO ESTABLISH A RIGHT TO MAINTAIN THE ATTACHMENT*

When a defendant moves to vacate an attachment pursuant to Supplemental Admiralty Rule E, the plaintiff bears the burden of showing that the filing and service requirements of Supplemental Admiralty Rules B and E were met and that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006).  If the plaintiff fails to demonstrate that it has met the requirements, the Court must vacate the attachment. Plaintiff, however, is not required to prove its case, it must simply meet a *prima facie* standard. See:  *Ronda Ship Mgmt. v. Doha Asian Games Organizing, Comm.,* No. 07 Civ. 94, 2007 U.S. Dist. LEXIS 72694, 2007 WL 2812897, at *3 (S.D.N.Y. Sep. 20, 2007)("The majority of courts in this district have understood *Aqua Stoli* to require the application of the *prima facie* standard when considering the adequacy of a claim in a maritime vacatur motion.")

Once defendant's property has been restrained by a maritime attachment order, Rule E(4)(f) provides defendant an opportunity to appear before the Court to contest the attachment. See Fed. R. Civ. P. Supp. R. E(4)(f).  At a Rule E(4)(f) hearing, defendant "can attack the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Fed. R. Civ. P. Supp. R. E(4) advisory committee's note.

If plaintiff carries its burden to show that an attachment satisfies the requirements, the district court still may vacate the attachment if "1) the defendant is present in a convenient adjacent jurisdiction; 2) the defendant is present in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for a judgment." *Aqua Stoli Shipping Ltd.,* 460 F.3d at 436.

ProShipLine's Verified Complaint states that the maritime attachment is necessary to secure jurisdiction over Aspen and to provide a fund from which to satisfy any eventual award rendered by the Singapore arbitration tribunal.  As established by correspondence from ProShipLine's counsel, Michael Polonsky, ProShipLine has refused to arbitrate its claims against Aspen in Singapore, stating that it intends to litigate its claims in the United States District Court for the Southern District of Texas.  *Bangad Decl. at ¶ 19 and Exhibit L thereto.*  Given the clear admission by ProShipLine that the basis for its seeking a maritime attachment against Aspen is no longer valid, ProShipLine cannot meet the minimum standards imposed by *Aqua Stoli* and the attachment should be vacated.

a.      ***ProShipLine's claims being asserted in this action are executory and will not support admiralty jurisdiction.***

EP-Team/ProShipLine's claims forming the basis for its demand for a maritime attachment are based upon the alleged breach of an executory contract.  EP-Team/ProShipLine is seeking monetary damages for the alleged repudiatory breech of the Agreement under which EP-

Team/ProShipLine was to be compensated for providing services to any vessel under Aspen's control which was expected to call at US ports in the future. This type of contractual situation has been held not to support a finding of admiralty jurisdiction:

> However, Dolco's claims for economic damages (its Second and Third Causes of Action) resulting from alleged repudiatory breach of the Agreement or the Oral Agreement by Moonriver do not create an admiralty jurisdiction. Despite the fact that the Agreement and Oral Agreement pertain to just one vessel, the four year commitment to supply all operational items for the Vessel is analogous to requirements contracts that courts have found to be outside of admiralty jurisdiction, rather than the one-transaction supply or repair contracts that fall within admiralty jurisdiction. See *Compania Argentina,* 144 F. Supp. at 14 (distinguishing executory contracts for repair of a specific ship at a specific time as within admiralty from general requirements contracts as outside of admiralty); *Steamship Overdale Co. v. Turner,* 206 F. 339, 341 (E.D. Pa. 1913) (contract to supply fuel to fleet of ships not within admiralty jurisdiction); *Garcia, 9 F. Supp. at 1011* (same); cf. *The Yankee,* 37 F. Supp. 512, 514 (E.D.N.Y. 1941) (holding that entire repudiation of repair contract by the defendant is not within admiralty jurisdiction).

*Dolco Investments v. Moonriver Development,* 486 F. Supp. 2d 261 (S.D.N.Y. 2007)(Sweet, J.).

**b.**    ***PROSHIPLINE is not entitled to a Rule B Attachment because Aspen is amenable to suit in the United States District Court for the Southern District of Texas, Where PROSHIPLINE has its headquarters and principal place of business.***

The Second Circuit Court of Appeals has held that the district court may vacate an attachment if a defendant in a Rule B action is present in the district where the plaintiff is located.    *Aqua Stoli Shipping Ltd.,* 460 F.3d at 436. In the present action, the United States District Court for the Southern District of Texas has already found that Aspen is present within that district, where ProShipLine has its headquarters and principal place of business.    *See Opinion and Order dated December 18, 2007.*

ProShipLine's resort to the extraordinary procedural device of Rule B attachment is misplaced in this case. ProShipLine's attachment should be vacated and the Court should Order the immediate release of Aspen's funds being restrained by garnishee Citibank.[4]

**c.     By seeking a Writ of Maritime Attachment under the name of ProShipLine only, EP-Team/ProShipLine has perverted the intent of Rule B.**

ProShipLine has attempted a legalistic slight of hand with regard to the bringing of its action seeking a maritime attachment against Aspen. Aspen had filed its action against EP-Team in this Court on October 12, 2007. ProShipLine was aware of the Aspen action because funds had been restrained and notice given prior to the filing of the ProShipLine action. *See Orzel Decl. Exhibit F*. In addition, ProShipLine's counsel filed the ProShipLine action as being related to Aspen's action against EP-Team.

As pointed out by Sanjivv Bangad in his declaration, ProShipLine was set-up by EP-Team under the Agreement. *See Bangad Decl. ¶ 3*. In every other action that has been filed in connection with the Agreement, EP-Team/ProShipLine have been joint plaintiffs. By its own admissions, ProShipLine, as assignee, is asserting the rights of EP-Team against Aspen. ProShipLine's filing of a separate action seeking the issuance of a Rule B attachment is an attempt to manipulate the rules of pleading as they apply to suits filed in the Federal Courts in an effort to abuse the *ex parte* nature of Rule B attachments. It is to be noted that ProShipLine filed the attachment claiming to be assignees of the rights and liabilities under the Agreement from EP-Team. However, in an extraordinary maneuver, after this and the Singapore arbitration tribunal had (December 10, 2008) set a procedural timetable for the arbitration of disputes between Aspen and EP-Team, and the tribunal had asked about progress of the proposed parallel

---

[4] Due to the amount that is being held by ProShipLine and the extraordinary nature of ProShipLine's misuse of Rule B, Aspen asks that the Court order the immediate release of the restrained funds, without the automatic stay provided by F.R.Civ.P. 62 (a).

arbitration between ProShipLine and Aspen, EP-Team assigned its rights to "sue for and recover

damages from" Aspen to ProShipLine.

The issue of a party attempting to abuse the *ex parte* nature of Rule B is not new to this

District.  In *Rapture Shipping v. Allround Fuel Trading B.V. Chemoil,* Judge Keenan was faced

with a situation where a plaintiff seeking a Rule B attachment ignored an earlier filed action in

order to file a new law suit seeking the issuance of a Writ of Maritime Attachment and

Garnishment.  Judge Keenan held that:

> Rapture, by its own admission, did not seek a *Rule B ex parte* attachment.
> Once Allround answered, thereby consenting to the Court's jurisdiction,
> there could be no *ex parte* attachments because "security cannot be
> obtained except as an adjunct to obtaining jurisdiction." *Seawind
> Compania, S.A. v. Crescent Line, Inc.,* 320 F.2d 580, 582 (2d Cir. 1963).
> Now, by commencing 06-5296, Rapture has obtained the *ex parte* security
> anyway, even though 03-738 was still pending, and even though there was
> no longer any jurisdictional issue in that matter. In the Court's view, this is
> not the purpose of *Rule B*. Moreover, contrary to Rapture's contentions,
> 06-5296 is no different from 03-738. They arise out of the same event (the
> delivery of allegedly defective fuel), involve the same parties (other than
> the extra defendant in 03-738), and are pending in the same court at the
> same time.

*Rapture Shipping v. Allround Fuel Trading B.V. Chemoil,* 2006 U.S. Dist. LEXIS 60771
(S.D.N.Y. 2006)(Keenan, J.).

It is conceded that *Rapture Shipping* is distinguishable from the present case in that

ProShipLine's action seeking a maritime attachment has ostensibly different parties than the

action filed by Aspen filed against EP-Team.  That is not the case, however.  ProShipLine's

decision to file its Southern District of New York action individually can only be explained as an

effort to achieve exactly what it has achieved, the *ex parte* attachment of significant funds

belonging to Aspen.  Why else would the Southern District of New York be the only place in the

United States where EP-Team and ProShipLine are not joint plaintiffs?

Any issue regarding whether the *Rapture Shipping* rational should apply to the present action is cleared-up by *Chiquita Int'l Ltd. v. m/v BOSSE*, 2007 U.S. Dist. LEXIS 75729 (S.D.N.Y.)(Leisure, J.). In *Chiquita* Judge Leisure held that it was improper for the defendant in an earlier filed pending law suit to file a separate action against the plaintiff in the earlier filed action and to seek a maritime attachment. Both suits involved in the *Chiquita* case arose from the same contract and the same alleged breach of contract. Judge Leisure noted:

> Judge Keenan stated that it was improper for the plaintiff to obtain ex parte security when an earlier case arising out of the same event, between the same parties, and before the same court, was still pending, and jurisdiction over the defendant in the prior action was not an issue because the defendant had submitted to the jurisdiction of the Court. See *Rapture Shipping Ltd. v. Allround Fuel Trading B.V. Chemoil, No. 06 Civ. 5296, 2006 U.S. Dist. LEXIS 60771, 2006 WL 2474869, at *2 (S.D.N.Y. Aug. 28, 2006)*(Keenan, J.)(dismissing complaint and vacating attachment because action was wholly duplicative of prior pending action). Judge Keenan noted that "this is not the purpose of *Rule B*." Id. The instant case differs procedurally from Rapture Shipping Ltd. because the Chiquita and Bosse actions are not "wholly duplicative," [4] and Bosse is the defendant in the prior action, not the plaintiff. Nonetheless, Bosse obtained ex parte security that is inconsistent with the purposes of *Rule B*. As did the plaintiff in Rapture Shipping Ltd., Bosse obtained ex parte security even though an earlier case arising out of the same events, between the same parties, and before the same court, is still pending. In addition, Bosse would have no jurisdictional issues because GWF had already submitted to the jurisdiction of the Court by filing the Chiquita action.

*Chiquita Int'l Ltd. v. m/v BOSSE*, 2007 U.S. Dist. LEXIS 75729 (S.D.N.Y.)(Footnotes omitted).

Judge Leisure went on to criticize the actions of the plaintiff who sought to obtain the benefits of the *ex parte* nature of a maritime attachment:

> Essentially, Bosse abused the attachment process and took advantage of the *ex parte* nature of a *Rule B* order, despite Bosse's knowledge that GWF already was before the Southern District of New York in the related Chiquita action arising out of the same facts and between the same parties. The purpose of a maritime attachment is to "secure jurisdiction over an absent party and to get security for a potential judgment where the absent party's assets are transitory." *Aqua Stoli Shipping Ltd.*, 460 F.3d at 435. GWF, however, was not an "absent party," and securing jurisdiction was

> unnecessary considering the pending Chiquita action. Given Bosse's knowledge of the pending Chiquita action, seeking an ex parte order of attachment in the Bosse action was an improper practice and showed a want of equity on the part of Bosse. See *Maersk, Inc.,* 443 F. Supp. 2d at 528. Ultimately, Bosse's actions are not in accordance with the purposes of maritime attachments. Therefore, GWF's motion to vacate is granted.

*Id.*

ProShipLine did the exact same thing that "Bosse" did in the *Chiquita* case, it abused the maritime attachment process to try to gain a strategic advantage. ProShipLine, which is standing in the shoes of EP-Team, if it is truly the assignee of EP-Team, knew of the Aspen action against EP-Team. Instead of appearing in the Aspen action, where it would be entitled to assert a counterclaim and to seek counter security, ProShipLine filed a separate law suit which mislead the Court. ProShipLine knew that Aspen was before the Court and yet is still asserted that Aspen was not "found" within the district. ProShipLine should not be allowed to benefit from its questionable conduct. ProShipLine's maritime attachment should be vacated:

> [A] district court has the inherent authority to vacate an attachment "upon a showing of 'any improper practice' or a 'manifest want of equity on the part of plaintiff.' " *Blake Maritime v. Petrom,* 2005 WL 2975335 at *2 (S.D.N.Y.)(quoting Southern District of New York Former Local Civil Rule 12 (1986)). The Second Circuit has held that "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge." *Greenwich Marine v. s/s ALEXANDRA,* 339 F.2d 901,905 (2d Cir. 1965).

*Sea Transport Contractors v. Indus. Chemiques du Senegal,* 411 F. Supp. 2d 386,396 (S.D.N.Y. 2006).

**POINT II**

**ASPEN IS ENTITLED TO HAVE THE
AMOUNT OF PROSHIPLINE'S ATTACHMENT
LIMITED TO A REASONABLE AMOUNT**

In four different law suits filed in three Federal District Courts, EP-Team/ProShipLine has succeeded in forcing Aspen to either post security or has simply seized security in the approximate amount of US$3,032,503.00.[5]  At no point during the course of its dispute with Aspen, however, has EP-Team/ProShipLine offered any basis for its claimed US$5,750,000.00 in "damages."   In the absence of any evidence that the claimed amount is realistic, EP-Team/ProShipLine is not entitled to security.

Supplemental Admiralty Rule E (6) provides that "[w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given…"  See also: Sea *Transp. Contractors v. Indus Chemiques du Senegal*, 411 F. Supp 2d 386, 396 (S.D.N.Y. 2006).  EP-Team/ProShipLine has failed to provide any proof of its alleged loss due to the alleged breach of the Agreement.  EP-Team/ProShipLine has simply made bold assertions of "damages" arising from the end of the Agreement.  There has been no explanation as to how EP-Team/ProShipLine has arrived at the US$6,390,000.00 figure in its Verified Complaint.  There is no calculation for the US$5,750,000.00 it seeks in "restitution" under the Agreement and no basis for the US$640,000.00 figure it demands in potential legal fees and arbitrator expenses in a Singapore arbitration, in which ProShipLine has now advised that it will not now participate having taken an assignment (after commencement of these proceedings) from EP-Team (already in arbitration in Singapore under the Agreement) of "absolutely all rights that [EP-Team] had to

---

[5] EP-Team/ProShipLine is also holding funds that are acknowledged as belonging to Aspen in the amount of US$699,000.00.  These funds derive from ocean freights that were collected by EP-Team/ProShipLine on behalf of Aspen under the Agreement.  Aspen believes that EP-Team/ProShipLine's retention of these funds amounts to conversion and therefore does not include this amount in the aggregate of funds which EP-Team/ProShipLine has restrained as security.

sue for and recover damages from [Aspen]" under the very same Agreement pursuant to which it seeks damages.  *See Bangad Decl. ¶ 19* .

When faced with a Supplemental Admiralty Rule E (4)(f) and E (6) challenge, the plaintiff is not required to prove its damages with exactitude, "but the court must be satisfied that the plaintiff's claims are not frivolous." *Dongbu Express v. Navios,* 944 F. Supp. 235 (S.D.N.Y. 1996).  With the exception of a vague claim for "damages" and a demand for "restitution" ProShipLine has not provided any reasonable basis for its demand for US$6,390,000.00.  This is insufficient to withstand a challenge under Supplemental Admiralty Rule E.  *Daeshin Shipping v. Meridian Bulk Carriers,* 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y.)(reducing the amount of security when the plaintiff failed to produce evidence to the court to justify the demand).  The only thing that is known for sure about ProShipLine's demand for damages is that US$640,000.00 of the demand [potential legal fees and arbitration expenses in Singapore] is completely without merit as ProShipLine is on record with the Singapore arbitration tribunal that it will not participate in those proceedings.  *See Bangad Decl. ¶ 19.*

As ProShipLine has failed to provide any basis for its demand for damages, or to show that it has suffered any actual loss, the Court should vacate the attachment on the basis that the plaintiff has demonstrated no entitlement to any level of security and Order ProShipLine to pay Aspen its legal fees and expenses associated with this action.  At the very least, as ProShipLine is not participating in the Singapore arbitration, its demand for security to cover Singapore legal and arbitration fees should be vacated.

## POINT III

## ASPEN IS ENTITLED TO
## COUNTER SECURITY UNDER
## SUPPLEMENTAL RULE E(7)

Supplemental Admiralty Rule E (7)(a) provides:

> ### Rule E. - Actions in Rem and Quasi in Rem:  General Provisions
>
> (1) Applicability.
>
> Except as otherwise provided, this rule applies to actions in personam with process of maritime attachment and garnishment, actions in rem, and petitory, possessory, and partition actions, supplementing Rules B, C, and D.
>
> \*        \*        \*
>
> (7) Security on Counterclaim.
>
> (a) When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court, for cause shown, directs otherwise. Proceedings on the original claim must be stayed until this security is given, unless the court directs otherwise.

In the present case, ProShipLine admits to be holding US$699,000.00 belonging to Aspen. *See Orzel Decl. Exhibit G.*  Aspen has instituted a Rule B action against EP-Team which is pending before this Court seeking security for US$908,516.40 that Aspen claims it is owed by EP-Team.  As ProShipLine has chosen to circumvent that proceeding and has filed this action, in the event that the Court does not vacate ProShipLine's attachment, Aspen is entitled to counter security on its claims against ProShipLine in the amount of US$908,516.40.  *Result Shipping v. Ferruzzi Trading USA Inc.,*     56 F.3d 394 (2d Cir. 1995); *Afram Lines Int'l v. m/v CAPTAIN*

*YIANNIS,* 905 F.2d 347 (11th Cir. 1990); *Titan Nav. v. Timsco, Inc.,* 808 F.2d 400 (5th Cir. 1987)(holding that the purpose of counter security is to place the parties on an equality as regards security).

## CONCLUSION

Defendant Aspen Infrastructures, Ltd., asks that this Court enter an Order vacating the process of maritime attachment and garnishment issued at the request of plaintiff ProShipLine, Inc. In the alternative, if this Court does not vacate the process of maritime attachment and garnishment then defendant asks that this Court Order limit the plaintiff's total security including security which has been obtained in other attachment proceedings including but not limited to proceedings in the Western District of Washington, to a reasonable amount. In the alternative, if this Court does not vacate the process of maritime attachment and garnishment issued at the request of plaintiff then defendant Aspen requests that this Court Order plaintiff to post counter security in the amount of US$908,516.40 to secure any counter claim against plaintiff by defendant Aspen. In addition, defendant Aspen requests such additional, different and further relief as the Court deems just and proper.

Dated: New York, New York
         January 9, 2008

<div style="margin-left:40%">

**DEORCHIS & PARTNERS, LLP**
*Attorneys for Defendant*
ASPEN INFRASTRUCTURES LTD.

By:   **/S/ John A. Orzel**
         John A. Orzel (JO-2420)
         61 Broadway, 26th Floor
         New York, New York  10006-2802
         (212) 344-4700
         Our File:  2064-2

</div>

W:\2064-2\Legals\010908 Memo Of Law.Doc 1/9/08·